(Decided 4th December, 1890.)

THOMAS ROBERTS & CO. *vs.* CHARLES J. BONAPARTE.

*Construction of Contract—Written and Oral—Province of Court and Jury—Practice at law—Exception to Evidence.*

As a general rule the construction of all written documents is a question of law for the Court; and, when a contract is sought to be made out from such documents alone, it is for the Court to ascertain and determine its construction, whether the documents are many or few.

But whether the whole contract between the parties is contained in the written documents offered in evidence, or is partly to be found in the parol evidence, is a question proper to be submitted to the jury.

And where the contract has to be made out partly by written documents, and partly by parol evidence, it is a question for the jury, and not for the Court to determine what the contract was.

Where evidence is taken subject to exception, it is incumbent on the party objecting, before or at the close of the evidence, to apply to the Court, either by motion or prayer, to exclude the portion to which he objects; and if this is not done, the benefit of the original objection cannot be availed of on appeal.

Courts, in the construction of contracts, look to the language employed, the subject-matter, and the surrounding circumstances.

Roberts & Co. *vs.* Bonaparte.

APPEAL from the Court of Common Pleas.

This is an action at law brought by the appellants against the appellee, to recover a balance claimed to be due for advances. The case is stated in the opinion of the Court.

*Exception.*—At the trial the plaintiffs offered the three following prayers:

1. That by the contract bearing date February 27th, offered in evidence, the defendant became bound personally to account to the plaintiffs for the money to be advanced by them under said contract, according to its terms and conditions, and the jury are not at liberty to consider the testimony of the defendant, Charles J. Bonaparte, on the stand in this case, which was received subject to exception, to the effect that he did not so become personally responsible under said contract; and that if the jury find that after the plaintiffs had made the advances and payments set forth in the bill of particulars of the plaintiffs, at the request and by the authority of the defendant under said contract, the defendant by his letter of October 13th, 1888, required the plaintiffs to send him under said contract the sum of three thousand dollars, as therein set forth, and that thereupon the correspondence ensued between the plaintiffs and the defendant, set forth in the letters of the plaintiffs, dated respectively October 16th, October 17th, October 22nd and of October 24th, enclosing their check for $3,000, and of October 25th, re-enclosing the same, and in the letters of the defendant, dated October 15th, October 17th, October 19th, October 20th, October 22nd, October 23rd, October 25th and October 26th; and if they shall further find that at the time the defendant received the check for $3,000, that amount exceeded by from four to five hundred dollars, the amount which the defendant had been called upon to pay on account of the canning business;

Roberts & Co. *vs.* Bonaparte.

and if they shall further find that the defendant refused to proceed further under said contract of February 27th, 1888, and to deliver any more canned goods thereunder to the plaintiffs in the manner and under the circumtances set forth in said correspondence, and took all of the goods then on hand in the factory into his own possession, and retained the same in the manner set forth in the evidence, the plaintiffs are entitled to recover so much of said advances, with interest thereon, as the jury may find remained unpaid at the time of the institution of this suit.

2. That if the jury find that the defendant, by his words and conduct, held out the witness, Manning, as his agent, and as having authority as such agent to make changes in prices purporting to be made in the correspondence between the said Manning and the plaintiffs offered in evidence, and that the plaintiffs had reasonable ground to believe from the defendant's words and conduct, and were thereby induced to believe, and did believe, that the said Manning had such authority, then the plaintiffs were thereby fully authorized to make sales at such changed prices, although the jury may find that in fact the defendant never did actually authorize the said Manning to make said changes in prices.

3. That if the jury find that the plaintiffs, in performance of the contract dated February 27th, 1888, offered in evidence, made sales of all the tomatoes specifically mentioned in said contract, and called upon the defendant to ship the said tomatoes to the purchasers thereof, then the plaintiffs are entitled to charge the defendant with their commissions of five per centum on all of said sales, although the jury may find that some of the said tomatoes were not shipped by the defendant to the plaintiffs or to the purchaser or purchasers thereof.

The defendant offered seven prayers, all of which are omitted except the one following:

7. That it is the duty of the jury to determine whether or not the whole of the contract between the plaintiffs and the defendant was embraced in the two paper-writings offered in evidence, signed by the plaintiffs and the defendant, respectively, and dated February 27th, 1888, and if they shall find that the whole of the contract was not embraced in the said two paper-writings, then it will be their duty further to find from all the evidence in the cause what the said contract was.

The Court (DUFFY, J.) rejected the first and third prayers of the plaintiffs, and all the prayers of the defendant save the seventh, which it granted; it granted also the second prayer of the plaintiffs. The plaintiffs excepted, and the verdict and judgment being in their favor for an amount less than their claim, appealed.

The cause was argued before ALVEY, C. J., MILLER, IRVING, BRYAN, FOWLER, MCSHERRY, and BRISCOE, J.

*Charles Marshall,* for the appellants.

.\* *William Reynolds, Bernard Carter,* and *William A. Fisher,* for the appellee.

When there is evidence from which it is competent to find the contract to have been partly oral and partly in writing, and when the jury believe this evidence, then it is for the jury to determine from the whole evidence what the entire contract between the parties actually was.

The well recognized general rule of interpretation has been very concisely laid down by Mr. Justice WOODWARD in *Warnick vs. Grosholz,* 3 *Grant's Cases, (Pa.,)* 235, as follows:

"When the words are written, the general rule is that the Court shall interpret them; but when they are merely spoken, the sense and meaning intended are for the jury."

---

\* Mr. Reynolds was present, but did not participate in the argument.

See also *Osgood vs. Lewis*, 2 *H. & G.*, 578, affirmed in *Horn vs. Buck*, 48 *Md.*, 370.

The reason for this is, that when an agreement has been reduced to writing, its meaning is entirely dependent upon the construction to be given to the ascertained words of the writing, and this is a pure question of law for the Court; but whenever a contract is verbal, its construction becomes largely dependent upon the ascertainment of the language actually employed by the parties, and the meaning which they understood it to convey at the time, and is then one of those mixed questions of law and fact which, under our practice, must be submitted to the jury as the appropriate tribunal to pass upon all disputed questions of fact. See *Cathell vs. Goodwin*, 1 *H. & G.*, 318; *Atwell vs. Miller & Mayhew*, 6 *Md.*, 19; *Risewick vs. Davis, Garnishee, &c.*, 19 *Md.*, 94; *Bloomer vs. State*, 48 *Md.*, 540.

The construction of a contract *partly* oral is obviously quite as much a mixed question of law and fact as the construction of one *wholly* oral, and therefore must of necessity, be submitted to the same tribunal for decision. " A contract partly in writing and partly in parol becomes a mere verbal contract.  When it is necessary to resort to oral evidence to establish the terms of a contract, then the whole contract is regarded as a verbal one." *Tomlinson vs. Briles*, 101 *Ind.*, 538; *Higham vs. Harris*, 108 *Ind.*, 246; *The Louisville, N. A., and Chicago Ry. Co. vs. Reynolds*, 118 *Ind.*, 170, (*S. C.*, 20 *N. E. Rep.*, 711.)

The following authorities directly sustain the proposition that the construction of a contract, partly oral and partly written, must be submitted to the jury for decision. *Bolckow vs. Seymour*, 17 *C. B.*, (*N. S.*,) 107, approved in *Goddard vs. Foster*, 17 *Wallace*, 123, 142; *Brown vs. McGran*, 14 *Peters*, 479, 498; *Farwell vs. Tillson*, 76 *Maine*, 227, 239; *Homans vs. Lambard*, 21 *Maine*, 308, 313; *St. Louis Nat. Stock Yards vs. Wiggin's Ferry Co.*,

102 *Ills.*, 514, 517; *Fagin vs. Connoly*, 25 *Mo.*, 94; *Cobb vs. Wallace*, 5 *Coldwell*, 539, 542; *Edwards vs. Goldsmith*, 16 *Penna. State*, 43, 49; *Foster vs. Berg*, 104 *Penna. State*, 324; *Reissner vs. Oxley*, 80 *Ind.*, 580, 584.

The principal difference between the parties is with respect to *the question of fact—what* constituted a contract for the season of 1888?

In cases in which it is admitted that the contract, if there be any, is in writing, the jury will of course, be allowed to enquire only into its execution.

But when it is denied that the whole contract between the parties is embraced in the writing offered, the jury must pass upon the fact and ascertain it. If, upon such inquiry, it shall turn out that the contract consists partly of a writing and partly in verbal communications, the jury must construe the whole. We cite in support of those propositions, in addition to the foregoing cases, the following: 1 *Story on Contracts, sec.* 818; 1 *Thompson on Trials, sec.* 1083; *Moore vs. Garwood*, 4 *Exchequer*, 689; *Foster vs. Mentor Life Assurance Co.*, 4 *Ellis & Black.*, 53, 56, 79; *Power vs. Barham*, 4 *Adol. & Ellis*, 473; *Routledge vs. Ramsay*, 8 *Ad. & Ellis*, 222; *Smith vs. Thompson*, 8 *Man., Gran. & Scott*, 58, 59; *Jennings vs. Sherwood*, 8 *Conn.*, 127; *McKean vs. Wagenblast*, 2 *Grant's Cases*, 465–6; *Goddard vs. Foster*, 17 *Wallace*, 142.

MILLER, J., delivered the opinion of the Court.

The controversy in this case is over a contract relating to the packing and sale of canned corn and tomatoes. The parties are widely apart as to what the contract actually was, as to its construction, and as to their respective rights and obligations under it. The appellants contend that the entire contract is embodied in the two written papers dated the 27th of February, 1888; that no parol or extrinsic evidence is admissible to modify or vary it; and that, by its true construction, the

Roberts & Co. *vs.* Bonaparte.

appellee is personally responsible to them for the moneys advanced to him under it, just as if it had been so much money *loaned to him* by them. On the other hand, the appellee insists that these papers do not contain the entire contract; that there was a verbal agreement between them, made at or before the date of these papers, to the effect that his responsibility was to be limited to seeing that the money advanced to him by the appellants should be applied by Clagett, the packer, to the purpose of canning corn and tomatoes at the cannery in question, and not wasted, or devoted by Clagett to any other purpose; that this was the extent of his liability; and that this parol agreement is in no wise in conflict with anything contained in these papers, construed, as they must be in the light of surrounding circumstances, and the relation of the parties to each other and to Clagett at the time they were signed. The testimony of the appellee as to the making of this parol agreement, and as to conversations at various interviews he had with the appellants, and their testimony in contradiction of his version of such conversations, as well as other written documents and a large number of letters which passed between them, and between the appellants and Clagett, and others, in relation to the business in question, some dated before and some after the 27th of February, 1888, were offered in evidence. All this testimony was allowed to go to the jury by agreement of counsel, subject to exception. When the testimony was all in, the Court was not requested by either party to exclude any portion of it from the consideration of the jury, except in so far as the appellants' first prayer may be regarded as an exception to the admissibility of so much of the appellee's testimony as relates to the parol agreement referred to. A number of prayers were offered on both sides, and the only exception taken to the rulings of the Court below is to the rejection of the

appellants' first and third prayers and the granting of the appellee's seventh prayer.

By the exception, this ruling is the sole subject of review in this Court, and we shall first consider whether there was any error in granting the appellee's seventh prayer, because we regard that as the most important question in the case. By granting this prayer, the Court instructed the jury that it was their duty "to determine whether or not the *whole of the contract* between the plaintiffs and defendant was embraced in the two paper-writings offered in evidence, signed by the plaintiffs and defendant, respectively, and dated the 27th of February, 1888; and if they shall find that the whole of the contract was not embraced in the said two paper-writings, then it will be their duty further to find, from all the evidence in the cause, what the said contract was."

Assuming the testimony to be admissible, this instruction asserts, first, that it is for the jury to find therefrom whether the contract was wholly in writing, or partly in writing and partly in parol; and second, if they find it of the latter character, then they, and not the *Court*, are to decide from all the evidence, written and oral, what the contract, as a *whole*, actually was. Now, in the first place, it is a proposition about which there can be no doubt that a contract may be partly in writing and partly in parol. This is recognized in all the numerous cases in which the Courts have held that parol evidence is admissible to prove some independent collateral or suppletory verbal agreement about which the written contract is silent; and this Court, in *McCreary vs. McCreary*, 5 *G. & J.*, 157, 158, has adopted the language of *Starkie* in his work *on Evidence*, where it is said "it may be shown that a parol contract was made, independently, wholly collateral to and distinct from a written one made at the same time. In such cases the parol evidence is used, not to vary the terms of the writ-

ten instrument, but to show either that it is inoperative as an *entire* and independent agreement, or that it is collateral and irrelevant; and, in many instances, the terms reduced to writing, may constitute but a small part of the *real contract.*'' When cases of this kind occur, is it for the Court or jury to determine what the real contract is? and if for the latter, have they a right to consider all the evidence written as well as oral bearing upon the subject? The general rule undoubtedly is that the construction of all written documents is a question of law for the Court, and when a contract is sought to be made out from such documents alone, it is for the Court to ascertain and determine its construction, whether the documents are many or few. So, where technical terms are used in a written contract, and parol testimony is introduced as to the meaning of such terms which necessarily goes to the jury, the Court will give them conditional instructions as to the effect of the contract, according as they may find the meaning of such terms to be. But this is not a case of that character. The question here is, upon the assumption that this contract was partly in writing and partly by parol, are the jury at liberty to determine from all the evidence in the cause, written as well as oral, what the contract actually was? We are not aware of any case in Maryland in which this precise question has arisen and been decided; but it would seem to be well settled by decisions of the highest authority elsewhere. Thus in *Bolckow vs. Seymour*, 17 *Com. Bench, N. S.*, 107, the suit was on a contract, and there had been a long correspondence and various interviews between the parties, of which parol evidence was given. At the trial Lord Chief Justice ERLE left it to the jury to say whether, taking the whole of the correspondence and the parol evidence together, there was any such contract as that declared on. This ruling was affirmed by the Court of Common Pleas on

motion for a new trial on the grounds of *misdirection,* and that the verdict was against the weight of evidence, KEATING, J., saying: "I think it is clear that parol evidence was admissible to show what was the real con tract between the parties, and, that being so, the whole must necessarily be a question for the jury." Again, in *Moore vs. Garwood,* 4 *Excheq.,* 681, it was held by the Court of Exchequer Chamber that as the evidence in the case did not depend altogether upon written instruments, but upon other matters of fact, it was a question for the jury, and not for the Judge, to determine what was the contract between the parties. In *Foster vs. Mentor Life Assurance Company,* 3 *Ellis & Black.,* 78, it was said by Lord CAMPBELL, C. J., "if there was any parol evidence on which the issue was to depend, then, according to the well-known rule clearly stated by PATTESON, J., in delivering the judgment of the Exchequer Chamber in *Moore vs. Garwood,* the whole was for the jury." Also, as bearing on the same subject, reference may be made to *Smith vs. Thompson,* 65 *Eng. C. L. Rep.,* 44, and *Power vs. Barham,* 4 *Adol. & Ellis,* 473. Counsel for the appellee have also cited a large number of cases decided by the Federal and State Courts of this country to sustain the same position. Among them reference may be made to *Etting vs. Bank of the United States,* 11 *Wheat.,* 76; *Brown & Co vs. McGran,* 14 *Pet.,* 479; *Goddard vs. Foster,* 17 *Wallace,* 142; *Farwell vs. Tillson,* 76 *Me.,* 239; *Smith, Adm'r vs. Faulkner, et al.,* 12 *Gray,* 256; *Jennings vs. Sherwood,* 8 *Conn.,* 127; *Edwards vs. Goldsmith,* 16 *Penn. State Rep.,* 43; *Mc-Kean vs. Wagenblast,* 2 *Grant's Cases,* 466 ; *Foster vs. Berg & Co.,* 104 *Penn. State Rep.,* 324; *Fagin vs. Connoly,* 25 *Mo.,* 94. The same doctrine is also stated by the text writers. Thus, in 1 *Taylor on Evidence, sec.* 36, it is said that "where a contract has to be made out partly by letters and partly by parol evidence, the jury

must deal with the whole question." So in 1 *Story on Contracts, sec.* 818, it is said "if a contract is to be made out partly by written documents and partly by oral evidence, the whole becomes a question for the jury." The law is also stated to the same effect in 1 *Thompson on Trials, sec.* 1083. It is to be observed that this seventh instruction does not leave it to the jury to *construe* the contract, but simply to find *what it was,* and we are of opinion the Court below committed no error in granting it.

The appellants' first prayer asserts, among other things, that "by the contract bearing date February 27th, offered in evidence, the defendant became bound, personally, to account to the plaintiffs for the money to be advanced by them under said contract, according to its terms and conditions, and the jury are not at liberty to consider the testimony of the defendant, Charles J. Bonaparte, on the stand in this case, which was received subject to exception, to the effect that he did not so become personally responsible under said contract." If this part of the instruction is erroneous, the Court was clearly right in rejecting it. It must be noticed that the particular part of the testimony of Mr. Bonaparte here referred to, is the *only* testimony which was asked to be excluded from the jury, and this Court is not at liberty to consider the admissibility of any of the other testimony taken in the case. It is true it is stated in the bill of exceptions that a great deal more of it was taken subject to exception, but in such case it is incumbent on the party objecting, before or at the close of the evidence, to apply to the Court, either by motion or prayer, to exclude the portion to which he objects, and thus have the question of its admissibility definitely disposed of by the Court below by its ruling on such application. If this is not done, the benefit of the original objection cannot be availed of in this Court.

"The mere statement in a bill of exceptions that certain evidence was offered and objected to, but admitted subject to the objection, to be disposed of at a subsequent stage of the trial, does not by any means raise the question here as to the admissibility of such evidence." *Basshor & Co. vs. Forbes,* 36 *Md.,* 154. The admissibility of this particular part of the testimony being, then, the only subject of review, let us see what the two papers of the 27th of February, 1888, which the appellants insist contain the entire contract, and with which this testimony is supposed to conflict, really are. As set out in the record they are as follows:

Paper No. 1, signed by Mr. Bonaparte:

"Thomas Roberts & Co. are hereby authorized to sell on their regular commission account and terms, the following goods, pack of 1888, *furnished them* by Thomas Claggett, of W., Upper Marlborough, Md.:

| | | | |
|---|---|---|---|
| 3000 cases Weston 3rd tomatoes, | - - - 92½ | All sales made f. o. b. Marlborough St., if |
| 6000 " Weston 2nd corn, | 90 | possible, or Baltimore, |
| 6000 " Meadow Grove 2nd corn, | - - 85 | if not possible, at through freight rates. |

"T. R. & Co. agree to guarantee the sale of the above goods at prices named, subject to the conditions endorsed hereon, which are parts of the contract.

CHARLES J. BONAPARTE.

### Conditions of this Order.

"1. Whenever a shipment is made T. R. & Co. are to be charged the prices named, less 5 per cent. commission, and $\frac{95}{100}$ per cent. discount, and interest at 6 per cent. is to be computed on such charge to final settlement.

"2. A final settlement is to be made on March 1st, 1889, or as soon previously thereto as the business of the year is entirely closed up.

"3. T. R. & Co. are further to guarantee the sales at the above prices of any other goods of the foregoing classes which T. C. of W. shall pack by their written advice, or with their consent, in writing, unless other prices shall be at the same time agreed to between them in writing.

"4. This order is given in consideration of an agreement of like date signed by T. R. & Co., with interlineations and additions by C. J. B., and is dependent for its validity thereon."

The second paper, signed by the appellants, is this:

"In consideration of a sales order of even date herewith, we do hereby agree with Charles J. Bonaparte, Esq., to furnish him the following amounts, in addition to advances mentioned in note hereto, of money, for the purpose of enabling Thomas Clagett, of W., to pack corn and tomatoes at the Weston factory, at 6 per cent. interest per annum during the season of 1888.

$3,000 previous to July 1st.
　3,000 during July.
　4,000 　" 　August.
　4,000 　" 　September.
　6,000 　" 　October.

$20,000

"We further agree to sell all the pack of the Weston cannery at the best possible prices on our regular commission account, viz., 5 per cent. All goods sold on 60 days' credit from time of shipment.

THOMAS ROBERTS & Co.

"Note:—It is further agreed, that if the said Charles J. Bonaparte should be, at any time, without funds necessary for packing corn and tomatoes at the said factory, Thomas Roberts & Co. shall, upon five days' notice

thereof, advance him such funds during the year 1888 on the terms above set forth as to the advances specifically mentioned, the intent hereof being that the said Charles J. Bonaparte shall be expected to invest no capital in the business."

It is manifest that these papers are ambiguous and uncertain in many important particulars, and need the aid of extrinsic evidence to render them intelligible. It is, moreover, a familiar principle that Courts, in the construction of contracts, look to the language employed, the subject-matter and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and in that view they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described. *Nash vs. Towne*, 5 *Wallace*, 699. Here then is enough on the face of these papers to show that, in order to give them a proper construction, according to the intention of the parties, the Court should be informed as to what was and had been the relation of Clagett to the parties respectively, what was his interest in the canning business referred to, and how and to what extent Bonaparte and Roberts & Co. became connected with it. A mass of testimony bearing on these subjects was offered, and without going into details, the material facts thus disclosed, as we understand them, are as follows: Clagett and wife owned an estate containing over six hundred acres of land near Upper Marlboro., in Prince George's County, and near the line of the Baltimore and Potomac Railroad. They had mortgaged this estate for the sum of $18,000 to Mr. Bonaparte, a member of the Baltimore bar, actively

engaged in the practice of his profession and a gentleman of large fortune. On this farm Clagett established a canning factory and had sold his products, chiefly canned corn and tomatoes, through Roberts & Co., who were wealthy and extensive merchants in Philadelphia, engaged in the business of buying and selling canned goods on commission. In this way the products of this cannery, with Clagett's labels or trade-marks on them, became extensively known, and had acquired a very favorable reputation in the market. Properly conducted, this business was a profitable one, but Clagett, who seems to have been improvident, careless and speculative, fell into financial embarrassment, and became insolvent. The farm was sold under the mortgage and bought in by Bonaparte for $10,000, leaving some $7,000 or $8,000 still due on the mortgage debt. After his purchase, Bonaparte leased the farm to Clagett for five years, thereby giving him the opportunity, by carrying on the canning business, to make money enough, if he could, to buy back the farm. It became necessary, however, that Clagett, who was most anxious to carry on the business, should have pecuniary aid from some one. Roberts & Co. were willing to advance him the money provided they received the products of the cannery for sale and reimbursement for their advances. But the difficulty in the way was the fact that Clagett's creditors might attach these products as Clagett's property, and it, therefore, became necessary that the legal title both to the cannery and machinery, as well as the products thereof, made by the means of such advances, should be placed in some one who could rightfully and lawfully protect them from the claims of such creditors. Bonaparte consented to aid in removing this difficulty, and thereupon Clagett and wife executed to him a bill of sale of all the personal property on the farm, including the cannery and its machinery, in consideration of a re-

lease by him of the balance due on his mortgage. The five years' lease was cancelled by mutual consent, and he gave, and Clagett accepted, a lease of the property by the month, at a monthly rent of $90, amounting yearly to the interest on the original mortgage debt of $18,000. He thus placed himself in a position in which, by allowing *his name* to be used in conducting the business, that is to say, by having the advances to Clagett made through him, and by his giving the sales orders for the products, the interference of Clagett's creditors could be effectually prevented. Under such an arrangement the business for the year 1887 was conducted, and more than $40,000 was furnished by Roberts & Co. through Bonaparte, who signed a sales order similar to that contained in the first of these papers, dated the 27th of February, 1888. In this transaction for the year 1887 the personal liability of Bonaparte was expressly limited to that of acting "as Clagett's security for advances in money to the extent of $2,500, to purchase tins." He had no interest in the profits of the business, if any should result—these were all to go to Clagett—and he charged nothing for the use of his name or for the trouble he had in transmitting the money he received from Roberts & Co. to Clagett, and keeping the accounts between them. When the time approached for making an arrangement for the year 1888, when it was expected that a much larger sum of money would be required, several letters passed between the parties, in which Bonaparte insisted, as one of the conditions on which he would do anything, that he "should not be called upon to make any investment of *capital*," and to this Roberts & Co. assented. The negotiations by correspondence failed, and after Bonaparte had informed them by letter, dated the 25th of February, that he understood that negotiations between them were at an end, he had an interview with them, at their request,

on his way through Philadelphia. At this interview, which took place on the 27th of February, the day these papers are dated, though they were not actually signed till some days afterwards, the differences between them were adjusted, and these papers were subsequently signed.

Now, in the light of these facts and circumstances, it becomes clear that the clause in the paper signed by Roberts & Co., by which they agree to "*furnish*" Bonaparte "the following amounts in addition to advances mentioned in note hereto, of money *for the purpose of enabling* Thomas Clagett, of W., to pack corn and tomatoes at the Weston factory at 6 per cent. interest per annum during the season of 1888," does not mean that they were to *loan him* this money at 6 per cent. in order to *enable him to carry on this canning business.* Such an interpretation would, in fact, nullify the subsequent clause, which says "the intent hereof being that the said Charles J. Bonaparte shall be expected to *invest no capital* in the business," as well as the obvious intention of the parties gathered from all the surrounding facts and circumstances. If he *borrowed* this money for the purpose of carrying on this business he invested *his capital* in it just as much as if he had used his own money in it. Besides, it is not only improbable, but almost absurd, to suppose that Bonaparte, who had abundance of money lying in bank, for which he was receiving but 3 per cent., would borrow from Roberts & Co. at 6 per cent. for the purpose of engaging in this business. We, therefore, think that a verbal agreement to the effect that the personal responsibility of Bonaparte, in regard to the funds to be supplied by Roberts & Co., should be limited to seeing that they were applied by Clagett to the canning of corn and tomatoes at this factory, is not only not in conflict with the terms of these papers, properly construed, but in entire harmony therewith,

and we are clearly of opinion that the testimony of Bonaparte that such an agreement was actually made at the Philadelphia interview was admissible in evidence. It follows that the Court below was not in error in rejecting this first prayer of the appellants.

The appellants' third prayer was also properly rejected, if for no other reason, because the evidence shows that it was not the fault of the appellee that the tomatoes therein referred to were not supplied to the appellants, but of Clagett, who was to furnish them, in not packing them.

*Judgment affirmed.*

(Decided 4th December, 1890.)